**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| BRIAN F. HYNES; VENDOR ASSISTANCE PROGRAM, LLC; BLUE STONE FINANCE, LLC; GREYSAND FINANCE, LLC; GREYSAND CAPITAL, LLC; | CIVIL NO.: _____ |
| Plaintiffs | RE: |
| v. | DEFAMATION |
| FORDE & O'MEARA LLP; MICHAEL K. FORDE; LEONARD TRIAL LAWYERS LLC; MICHAEL I. LEONARD; | |
| Defendants | |

## <u>VERIFIED COMPLAINT</u>

**TO THE HONORABLE COURT:**

      **COME NOW** Plaintiffs, Brian F. Hynes ("Mr. Hynes"), Vendor Assistance Program, LLC ("VAP"), Blue Stone Finance, LLC ("BSF"), Greysand Finance, LLC ("GSF") (as successor of BSF), and Greysand Capital, LLC ("GC") (as successor of Bluestone Capital Markets, LLC ("BCM")) (BSF and BCM, collectively, are the "Bluestone Entities") (GSF and GC, collectively, are the "Greysand Entities")[1] (all the appearing parties, collectively, are the "Plaintiffs"), each through their undersigned respective counsel, and very respectfully allege and request as follows:

### I.    <u>INTRODUCTION</u>

      This case comes about due to Defendants' ongoing defamatory campaign against Plaintiffs. Although these actions are taking place primarily in Illinois, Defendants knowingly

---

[1] GC is the assignee of BCM and GSF is the assignee of BSF. Therefore, all damages inflicted on the Bluestone Entities by Defendants' actions are reflected on the Greysand Entities, as assignees.

have injured Puerto Rico citizens –particularly, Mr. Hynes– in Puerto Rico. For the past months, Defendants have been relentless in their efforts to oust VAP as a participant in the Illinois Vendor Payment Program (explained in detail further below). This program allows state of Illinois vendors to assign delinquent invoices to institutions approved by the state of Illinois as "Qualified Purchasers." Upon information and/or belief, Defendants' disparaging actions have included frivolous litigation, outreach to Illinois officials, and a defamation campaign waged through national media, focused particularly on, and causing harm to, Mr. Hynes, VAP, the Bluestone Entities and the Greysand Entities (as assignees).

By making false and slanderous statements and leaking otherwise sealed court documents to reporters, Defendants have caused the publication of media articles that falsely accuse Mr. Hynes and the Bluestone Entities, of engaging with VAP in a scheme to defraud the state of Illinois by evading taxes on income derived from the Illinois Vendor Payment Program ("Vendor Payment Program"). As the makers of these false and slanderous statements, Defendants are accountable for their foreseeable republication in a news story. These severe accusations have injured each of the Plaintiffs –not only where they reside (in Mr. Hynes', BSF's and GSF's case, Puerto Rico), but also at a national level. But as Defendants are well aware and is easily verifiable with publicly available documents, there is nothing improper (let alone fraudulent) going on.

As explained below, the Defendants are not only liable for committing slander against Mr. Hynes, VAP and the Bluestone Entities, but also for republication libel arising from the foreseeable publication of a media news article that falsely accuses VAP of fraudulently submitting claims (invoices) to the state of Illinois, knowing full well that Plaintiffs have **never** submitted an invoice to the state of Illinois for payment or caused another contractor to submit a false invoice for payment; nor created any false statements used in the submission of false

2

invoices. In fact, because Plaintiffs do not have a contract with the state of Illinois, it is impossible for Plaintiffs to submit an invoice for payment. In addition, Defendants falsely accused VAP of fraudulently reassigning invoices and supporting their actions with false documents, knowing full well that Plaintiffs have **never** been assigned a receivable to reassign under the Vendor Payment Program, much less have they misrepresented reassigning any Vendor Payment Program receivable. Additionally, Defendants knew that even if the Plaintiffs had ever been assigned an invoice for reassignment, the Plaintiffs were never prohibited from reassigning invoices to the Bluestone Entities. Defendants also falsely accuse Plaintiffs of misleading the State by not disclosing the Bluestone Entities on VAP's "Financial Backer" (owner) disclosures knowing full well from public records that the Bluestone Entities never had an ownership interest in VAP. Moreover, Defendants filed a *qui tam* action under the Illinois False Claims Act ("IFCA"), making a public allegation (avoidance of Illinois income taxes) knowing full well that such allegations are specifically excluded from said act and that the Vendor Payment Program did not require Qualified Purchasers to pay Illinois income taxes.

As explained in further detail below, since none of the Plaintiffs were ever assigned a receivable under the Vendor Payment Program, none of the Plaintiffs receive or have ever received any payments from the state of Illinois under the Vendor Payment Program. VAP manages various Delaware domiciled statutory trusts that are sponsored by Bank of America, Barclays Bank PLC ("Barclays"), and Blackstone Inc. ("Blackstone"). These Delaware domiciled statutory trusts were approved by the state of Illinois as Qualified Purchasers. It is precisely these trusts (as Qualified Purchasers) that were assigned receivables and therefore receive payments under the Vendor Payment Program ("Qualified Purchaser Trusts"). This framework is legally approved by the state of Illinois and is of public knowledge. Each respective

3

Qualified Purchaser Trust is domiciled in Delaware and, therefore, not subject to Illinois income taxes. While it is true that the payments would be subject to Illinois income taxation (subject to any applicable exemptions) *if* the Qualified Purchaser Trusts were domiciled in Illinois, the state of Illinois does not require Qualified Purchasers to be domiciled in Illinois. *Cf.* 74 Ill. Adm. Code 900.125(f).

VAP's compensation is entirely paid by these Qualified Purchaser Trusts for VAP's management and servicing of the Qualified Purchaser Trusts. In turn, BSF provides back-office services to VAP from its Puerto Rico offices in furtherance of VAP's management of these Qualified Purchaser Trusts and receives compensation from VAP for such services. BCM also provides services to VAP in furtherance of its management of the Qualified Purchaser Trusts. Mr. Hynes has an indirect membership interests in VAP, the Bluestone Entities and the Greysand Entities.

Additionally, Defendants are aware that the state of Illinois (on whose behalf a *qui tam* action was filed) did not and could not have suffered any monetary damages arising from the allegations raised in the *qui tam* action. As stated above, Illinois income tax matters are specifically excluded from the IFCA. Also, Illinois has adopted Revised Article 9 of the Uniform Commercial Code ("UCC"). Pursuant to the UCC, the state of Illinois, as Account Debtor, cannot have any economic consequence resulting from the *qui tam* action and cannot interfere with the assignee's ability to freely transfer and assign receivables. See, *e.g.*, 810 ILCS 5/9-406(d). Additionally, consistent with the UCC, the VPP Act, corresponding Administrative Rules and the Program Terms set forth the penalty to be imposed if a Qualified Purchaser violates the VPP Act or Program Terms. The only penalty is termination. The VPP Act and Program Terms specifically state that the termination does not impact existing obligations.

4

That some of the income that Mr. Hynes receives indirectly from VAP and the Bluestone Entities, the Bluestone Entities receive from VAP, and VAP receives from the Qualified Purchaser Trusts may originate from payments received by the Qualified Purchaser Trusts under the Vendor Payment Program is innocuous, and certainly not the product of fraud. In each case, the income constitutes compensation for services, not a payment from the state of Illinois under the Vendor Payment Program. The only payments under the Vendor Payment Program are made by the state of Illinois and, to date, every payment made has been to a Qualified Purchaser domiciled outside Illinois (this includes all Qualified Purchasers, not just VAP and the Qualified Purchaser Trusts managed by VAP). The state of Illinois, as of December 1, 2022, has directed over 38,000 payments totaling over 8 billion dollars under the Vendor Payment Program and not a single payment went to an Illinois domiciled Qualified Purchaser or Qualified Purchaser Trust. Defendants, who are attorneys, are or should have been aware of this, as this information is publicly available, in the case of all Vendor Payment Program information, and well-established business law related to the UCC. Still, they have maliciously conflated the facts to cause harm to Plaintiffs' reputation by impressing upon the media that the above structure amounts to an illegal tax-avoidance and fraud conspiracy. To this day, Defendants have not retracted their false statements nor cease and desist from engaging in efforts to advance this narrative in the media, thereby continuing to injure Mr. Hynes and BSF, in Puerto Rico, and VAP and GC, as successor in interest of BCM, causing Plaintiffs to file this action.

## II.   <u>JURISDICTION AND VENUE</u>

1.      This Honorable Court has jurisdiction over the present case pursuant to 28 U.S.C. § 1332, inasmuch as there is complete diversity of citizenship between Plaintiffs and Defendants,

and the amount in controversy exceeds the jurisdictional threshold of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

2.       Venue is proper in this district under 28 U.S.C. § 1391(a), and (b)(2), because a substantial part of the damages caused by Plaintiffs' actions were suffered and occurred in this district.

### III.    THE PARTIES

3.       Plaintiff Mr. Hynes is a citizen of Puerto Rico. His domicile address is 116 Dorado Beach East, Dorado, PR, and his telephone number is (787) 520-5593. Mr. Hynes is the Founder of VAP and the Founder and President of BSF.

4.       Plaintiff BSF is a Puerto Rico limited liability company. Its principal place of business is 1225 Ponce de León Avenue, PH-1188, San Juan, Puerto Rico 00907, and its telephone number is (787) 520-5593. Certain of BSF's assets and interests have been assigned to GSF. However, as of the filing of this *Complaint*, BSF is an active limited liability company organized pursuant to the laws of Puerto Rico. None of BSF's members are citizens of Illinois. BSF's sole members are:

> a.   AHG Group Holdings, LLC, a limited liability company organized under the laws of Florida whose sole member is the Alan H. Ginsburg Family Trust, whose sole beneficiary, in turn, is Mr. Alan H. Ginsburg, a citizen of Florida;
>
> b.   BFH Investments, LLC ("BFH"), a limited liability company organized under the laws of Puerto Rico, whose sole member is Mr. Hynes;
>
> c.   NAI Ark Funding, LLC, a limited liability company organized under the laws of Delaware, whose sole member is Mr. David Reape ("Mr. Reape"), a citizen of Pennsylvania.

6

d.  HFP Investors, LLC ("HFP Investors"), a limited liability company organized under the laws of Florida, whose members are:

    i.  Bluerock Investment Management, LLC, a limited liability company organized under the laws of Iowa, whose sole member is the Gene C. Harris Trust, whose sole beneficiary is, in turn, Gene C. Harris, a citizen of Florida.

    ii.  Julie A. Harris Trust, whose sole beneficiary is Julie A. Harris, a citizen of Florida.

    iii.  Rachel Harris, a citizen of New York.

    iv.  Will Harris, a citizen of New York.

    v.  Rebekah Harris, a citizen of Minnesota.

e.  Gorovitz Family Limited Partnership, a limited partnership organized pursuant to the laws of Florida, whose partners are the following:

    i.  RJ Wayhaven Management, LLC (a limited liability company also organized under the laws of Florida, whose sole members are, in turn, Mr. Aaron J. Gorovitz ("Mr. Gorovitz") and Elizabeth Shey Gorovitz ("Ms. Gorovitz"), citizens of Florida));

    ii.  Jeremy Gorovitz Trust (a trust organized under the laws of Florida, whose sole beneficiary is Jeremy Gorovitz, citizen of Florida);

    iii.  Marissa Gorovitz Trust (a trust organized under the laws of Florida, whose sole beneficiary is Marissa Gorovitz, citizen of Florida);

    iv.  Samuel Gorovitz Trust (a trust organized under the laws of Florida, whose sole beneficiary is Samuel Gorovitz, citizen of Florida);

      v.  Mr. Gorovitz and Ms. Gorovitz, in their personal capacity (for information as to their domicile see, *supra*, ¶ 4(e)(i)).

    f.  The Eleven Corporation, Ltd. (a corporation organized under the laws of Colorado).

5.    Plaintiff VAP is an Illinois limited liability company. Its principal place of business is 66 E. Walton, 2nd Floor, Chicago, Illinois 60611, and its telephone number is (312) 273-9520. None of VAP's members are citizens of Illinois. VAP's sole members are the following:

    a.  GBHH, LLC ("GBHH"), a limited liability company organized under the laws of Florida whose sole members are Neptune Investors, LLC ("Neptune Investors") (a limited liability company organized under the laws of Florida), and Tres Satos, LLC ("Tres Satos"), a limited liability company organized under the laws of Puerto Rico, whose sole member is Mr. Hynes.

      1.  Neptune Investors' sole member is AHG Group, LLC ("AHG Group"), a limited liability company itself organized under the laws of Florida.

        a.  AHG Group's members are Bluerock Real Estate Holdings, LLC ("Bluerock"), and AHG Group Holdings, LLC ("AHG Holdings"), both limited liability companies organized under the laws of Florida.

          i.  Bluerock's members are the following:

8

1. HFP Investors (for information as to its place of organization and members see, *supra*, ¶ 4(d)),

2. Gorovitz Family Limited Partnership (for information as to its place of organization and members see, *supra*, ¶ 4(e)).

ii. AHG Holdings' sole members is the Alan H. Ginsburg Family Trust, whose sole beneficiary, in turn, is Mr. Alan H. Ginsburg, a citizen of Florida

2. Tres Satos' sole member is Mr. Hynes, who, as sated above, is a citizen of Puerto Rico.

b. Neptune Investors, LLC (for information as to its place of organization and members see, *supra*, ¶ 5(a)(1));

c. NAI Ark Funding, LLC (for information as to its place of organization and members see, *supra*, ¶ 4(c));

d. Manchester Securities Corp. (a corporation organized under the laws of New York);

e. The Eleven Corporation, Ltd. (for information as to its place of organization and members see, *supra*, ¶ 4(f)).

6. Plaintiff GC is a Delaware limited liability company. Its principal place of business is 700 W Morse Boulevard, Suite 220, Winter Park, FL 32789, and its telephone number

is (407) 691-5600. GC is an assignee of all assets and obligations of BCM. None of GC's members are citizens of Illinois. GC's sole members are:

a. GBHH (for information as to its place of organization and members see, *supra*, ¶ 5(a));

b. NAI Ark Funding, LLC (for information as to its place of organization and members see, *supra*, ¶ 4(c));

c. The Eleven Corporation, Ltd. (for information as to its place of organization and members see, *supra*, ¶ 4(f));

d. and FGW Holdings, LLC, a limited liability company organized under the laws of Florida, whose sole member is Alan Wilson, a citizen of Florida.

7.      Plaintiff GSF is a Puerto Rico limited liability company. Its principal place of business is 1225 Ponce de León Avenue, PH-1188, San Juan, Puerto Rico 00907, and its telephone number is (787) 520-5593. GSF is an assignee of certain assets and obligations of BSF. None of GSF's members are citizens of Illinois. GSF's sole members are:

a. Tres Satos (for information as to its place of organization and members see, *supra*, ¶ 5(a);

b. AHG Group Holdings (for information as to its place of organization and members see, *supra*, ¶ 5(a)(1)(a)(ii));

c. NAI Ark Funding, LLC (for information as to its place of organization and members see, *supra*, ¶ 4(c));

d. HFP Investors, (for information as to its place of organization and members see, *supra*, ¶ 5(a)(1)(a)(i)(1));

e.  and Gorovitz Family Limited Partnership (for information as to its place of organization and members see, *supra*, ¶ 4(e)).

8.      Defendant Forde & O'Meara LLP ("Forde & O'Meara") is a limited liability partnership. It is a law firm located in Illinois; its mailing address is 191 North Wacker Drive, 31st Floor, Chicago, IL 60602. Upon information and belief, Forde & O'Meara only has offices in Illinois and its members are upon information and belief all residents and citizens of the state of Illinois.

9.      Defendant Michael K. Forde ("M. Forde") is an attorney who practices law in the state of Illinois. He has been the Managing Partner of Forde & O'Meara since 2012. His business address is at Forde & O'Meara. Upon information and belief, he is a resident and citizen of the state of Illinois.

10.     Defendant Leonard Trial Lawyers LLC ("Leonard LLC") is a limited liability company. It is a law firm in Illinois; its mailing address is 120 N. LaSalle St., 20th Floor, Chicago, IL 60606. Upon information and belief, Leonard LLC's only has offices in Illinois and its members are all residents and citizens of the state of Illinois.

11.     Defendant Michael I. Leonard ("M. Leonard") is an attorney who practices law in the state of Illinois. Upon information and belief, he is a resident and citizen of the state of Illinois. He is a partner at Leonard LLC. His business address is at Leonard LLC.

## IV.      FACTS

### A.  *The Illinois Vendor Payment Program*

12.     Defendants' defamation has taken place in two forms: (i) by knowingly and maliciously making false statements to the media regarding the involvement of VAP, the Bluestone Entities, and Mr. Hynes in the Vendor Payment Program; and (ii) in support of such

11

statements, leaking sealed court documents to the press tied to Defendants' collective ongoing litigation against VAP and the Bluestone Entities, in Illinois. Also, because it was foreseeable that their defamatory remarks would be republished and disseminated through the internet, Defendants are liable for republication libel.[2] Therefore, a brief overview of both the Vendor Payment Program and the litigation mentioned above is warranted to properly contextualize this defamation action.

13.     During the year 2010 and after that, in light of its difficulties in paying invoices from vendors supplying various services and products, the state of Illinois began a pilot program that was formally established the following year through emergency administrative rules and an initial set of program terms (the "2011 Program Terms").

14.     In December 2012, the state of Illinois updated the 2011 Program Terms to its current version (the "Program Terms") and amended the Illinois Administrative Code, formally creating the Vendor Payment Program (the "VPP Formal Start"). This process was done in close partnership with VAP as VAP was the only Qualified Purchaser from 2010 to 2014.

15.     The Vendor Payment Program was later codified in 2018 via Illinois Public Act 100-1089, which amended the Illinois Prompt Payment Act (the "VPP Act"). The Illinois statutory and administrative law sets forth extensive and detailed criteria for the Vendor Payment Program.[3]

16.     The Vendor Payment Program allows vendors of the state of Illinois ("Vendors") to assign approved and delinquent (unpaid beyond 90 days) invoices ("Qualified Account

---

[2] See, e.g., WBEZ Chicago, *A Lawsuit Alleges a Clout-Heavy Company Fraudulently Collected Millions from Illionis* (Abril 4, 2022), available on: https://www.wbez.org/stories/company-accused-of-defrauding-state-of-illinois/793c6305-ada1-4d3f-b1ce-e45f9cf1cf62.

[3] The terms of the Vendor Payment Program are publicly available at https://www2.illinois.gov/cms/About/VendorPayment/Documents/Vendor%20Payment%20Program%20Terms.pdf.

Receivables") to qualified institutions defined as Qualified Purchasers ("QP"). Upon being assigned the invoice, the QP immediately pays 90% of the invoice to the Vendor, with the remaining 10% paid when the QP receives full payment from the state of Illinois. In consideration, QPs retain prompt payment penalties that automatically accrued and would have otherwise been paid to the Vendors under the Illinois' State Prompt Payment Act, 30 ILCS 540 *et seq.*[4]

17.     Vendors are the ones to determine whether to assign a Qualified Account Receivable to a QP. Therefore, assignment to a QP is entirely at the Vendor's discretion. Vendors may wait for a state of Illinois payment of a Qualified Account Receivable instead of assigning it to a QP.

18.     QPs **never** submit invoices to the state of Illinois or play any role in the invoice or billing process. Page one of the Program Terms establishes that the invoicing is between the Vendors and the state of Illinois (not the QP). Each page of the Program Terms also states that QPs do not have a contractual relationship with the State, thereby making it impossible for QPs to submit invoices.

19.     For a Vendor's outstanding invoice with the state of Illinois to become a Qualified Account Receivable, the Vendor submitted invoice must be: (i) approved by the respective state of Illinois agency, (ii) approved by the Illinois Office of the Comptroller ("IOC"), and (iii) outstanding for over ninety (90) days. After State approval, the Qualified Account Receivable sits in the IOC queue, waiting for payment. After ninety (90) days sitting in the IOC queue, the already State approved Qualified Account Receivable can be assigned to a QP, and the Vendor

---

[4] If a payment is not made to a Vendor within 90 days of receipt of a proper invoice, an interest penalty of 1% of any unpaid amount will accrue for each month or, on a prorated basis, each fraction thereof that such payment is delayed after such 90-day period.

and the QP, in a private-party to private-party transaction, then execute a corresponding State form assignment agreement ("State Form Agreement"). Once assigned, the Vendor must inform the Illinois Department of Central Management Services ("CMS") of the assignment. CMS, in turn, submits the information to the IOC for confirmation that the Qualified Account Receivable has not been paid. Upon confirmation by the IOC, CMS issues a letter of acknowledgment to the QP. This letter of acknowledgment specifically identifies the receivables to be assigned and the amount approved to be paid by the State. **The identification is a printout from the IOC system, which is further evidence that QPs have no role in the invoice process.**[5] Within 10 days of receipt of that letter, the QP makes the initial payment of 90% of the invoice to the Vendor. Subsequently, the state of Illinois issues payment to the QP for the full amount of the invoice (including accrued interest), and the QP then pays the remaining 10% to the Vendor.

20.     The QPs do not have a contractual relationship with the state of Illinois. The state of Illinois emphasizes this fact on the footer of every page of the Program Terms. Consistent with the UCC, the State's only role in the Vendor-and-QP contractual relationship is as the Account Debtor. QP's only contractual relationship is with each respective Vendor, the terms of which are in the State Form Agreement and is governed by the UCC and the VPP Act. The footer on every page also states that if the Program Terms conflict with Illinois law (UCC) then the law (UCC) shall control.

21.     Consistent with the UCC, the State, as Account Debtor, has no financial interest in the outcome of the underlying *qui tam* action and cannot interfere with the assignees' right to freely assign receivables.

---

[5] **The Qualified Purchaser Trusts have been paid by the State for over 29,000 assignments under the Vendor Payment Program. In every instance, the paid invoice amount was the same as the IOC printout attached to the CMS letter of acknowledgment at the time of assignment.**

22.     Any entity that wishes to participate in the Vendor Payment Program must be approved as a QP by the state of Illinois. To that end, any such entity must apply for QP status approval with CMS.

23.     A bankruptcy remote trust or a special purpose entity may be approved as a QP provided that the trust or entity is established solely to purchase Assigned Qualified Account Receivables **and** is managed by an entity approved as a QP. To date, nine Delaware domiciled statutory trusts and thirteen Delaware domiciled special purpose entities have been approved as designated QPs.

24.     In September 2010, VAP was formed to participate in the Vendor Payment Program's pilot program.

25.     Twelve days after releasing the 2011 Program Terms, on or about March 30, 2011, CMS approved VAP as QP.

26.     Since the VPP Formal Start, VAP, as manager, has filed monthly reports with the IOC and with CMS listing all activity for the Qualified Purchaser Trusts managed by VAP for the previous month. These reports list an aggregate total of all receivables purchased, all assigned invoices, all penalty payments received, all receivables verified and acknowledged by the state of Illinois, and the aggregate amount of receivables purchased and outstanding for the collective Qualified Purchaser Trusts. Since the enactment of Public Act 100-1089 in 2018, all these reports have been posted on the IOC site. Additionally, as required by Public Act 100-1089, VAP and each respective Qualified Purchaser Trust have annually filed all required financial disclosures which list all entities that have a direct or indirect ownership interest in VAP and the Qualified Purchaser Trusts (not service providers). The VPP Act defined the disclosures as "Financial Backer Disclosures" and are posted on the website for the IOC.

27.     VAP is domiciled in Illinois and, although not required by the Vendor Payment Program, pays Illinois taxes on income derived through its management and servicing of the Qualified Purchaser Trusts.

28.     VAP currently manages two active Delaware domiciled Qualified Purchaser Trusts and has managed six Delaware domiciled Qualified Purchaser Trusts, all designated by the state of Illinois as QPs.

29.     The UCC specifically prohibits an Account Debtor (State) from (i) prohibiting an assignee from reassignment or (ii) requiring the consent of the Account Debtor (State) for reassignment. See, 810 ILCS 5/9-406(a). Provisions of the 2012 Program Terms that conflicted with the UCC were not included in the 2018 VPP Act.

30.     Since the VPP Formal Start, Section VI of every State Form Agreement executed by the Qualified Purchaser Trusts clearly limits the prohibition against reassignment (and need for CMS approval) in the Program Terms to persons or entities "**outside the Purchaser's control**." The State Form Agreements are the only contractual agreements entered by the Qualified Purchaser Trusts. Pursuant to the UCC, the State Form Agreements govern.

31.     Consistent with Section II(6) of the Program Terms, each respective Qualified Purchaser Trust that VAP managed: (i) was established solely to purchase Assigned Qualified Account Receivables; (ii) never utilized Sub-Participants (as defined in the Program Terms); (iii) purchased the Assigned Qualified Account Receivables utilizing a credit facility established solely for that purpose and managed by a QP (VAP); and (iv) pledged the Assigned Qualified Account Receivables as collateral for the credit facility.

32.     Pursuant to Section II(6) of the Program Terms, the Qualified Purchaser Trusts and VAP were permitted to collateralize the receivables and therefore never prohibited from

transferring the interest so long as the collateralized interest of the vendors is protected (pursuit of prompt payment penalty) by the QP (manager). Additionally, Section II(6) removed the requirement to seek approval from CMS prior to transferring interests of the collateralization.

33.    QPs must submit monthly reports detailing the amounts of receivables purchased and the amounts paid by the state of Illinois. If the respective QP is a manager of Qualified Purchaser Trusts, it is required to file monthly reports on behalf of the collective Qualified Purchaser Trusts. Since VAP never purchased receivables, its monthly reports list the aggregate totals for the Qualified Purchaser Trusts managed by VAP.

34.    VAP has **<u>never</u>** fraudulently created a document that failed to disclose to the state of Illinois any reassigned receivables, because VAP was never (i) required to disclose any reassignment to the State and (ii) was never assigned a receivable under the Vendor Payment Program to reassign.

35.    QPs must also submit annual Financial Backer Disclosures that list information on "each person, director, owner, officer, association, financial backer, partnership, other entity, corporation, or trust **<u>with an indirect or direct financial interest</u>" in each QP**. Qualified Purchaser Trusts are also required to list all beneficial owners. VAP and every VAP managed Qualified Purchaser Trust have always accurately reported this information.

36.    Including the twelve (12) months since the publication of the WBEZ article, republishing Defendants' defamatory allegations (see, *infra*, ¶¶ 63-67) , CMS and the IOC have not notified VAP that it was in violation of the Program Terms or the VPP Act nor terminated VAP pursuant to the VPP Act and Program Terms.

37.    The IOC and state of Illinois have never sent a Vendor Payment Program payment to an Illinois domiciled QP to date. Instead, all Vendor Payment Program payments have been

made to Delaware QPs or Delaware domiciled Qualified Purchaser Trusts and special purpose entities.

38.     The Vendor Payment Program does not require QPs to be domiciled in Illinois and pay Illinois income taxes.

39.     Only one current QP, VAP, is domiciled in Illinois.

40.     Since the VPP Formal Start, the state of Illinois has officially designated 24 QPs. Only two, including VAP, were domiciled in Illinois. As stated above, no Illinois domiciled QP was ever assigned or received payment on a receivable from the state of Illinois.

41.     Since the VPP Formal Start, VAP's income has exclusively been derived through its management of the VAP Managed Trusts. Accordingly, the IOC and state of Illinois have not paid VAP.

**B.   _The Bluestone Entities' Involvement (or Lack Thereof) with the Vendor Payment Program_**

42.     The Bluestone Entities were formed in 2017.[6] Of these entities, BSF holds a decree under Puerto Rico Act 20-2012.

43.     The Bluestone Entities provided services to VAP from their offices in furtherance of VAP's management of the VAP Managed Trusts and received compensation from VAP for such services. In the case of BSF, those services are provided from its office in Puerto Rico.

44.     The Bluestone Entities do not have a direct or indirect financial interest in VAP.

45.     The Bluestone Entities were not QPs and have never been assigned or reassigned a Qualified Account Receivable under the Vendor Payment Program or in violation of the Program Terms.

---

[6] As stated above, the Greysand Entities are the assignees of all the Bluestone Entities. Therefore, all damages inflicted upon the Bluestone Entities are reflected on the Greysand Entities, as assignees, and, thus, the Greysand Entities are entitled as a matter of fact and law to appear as plaintiffs in the instant case.

46.     The Bluestone Entities are not a Sub-Participant defined by the VPP and have never been assigned or reassigned a Qualified Account Receivable under the Vendor Payment Program or in violation of the Program Terms.

47.     BSF was neither a member, beneficiary, nor manager of VAP or the VAP Managed Trusts. BSF's relevant relationship with VAP and/or the VAP Managed Trusts consisted of certain services provided as per their agreements with VAP.

48.     The services provided by BSF (now GSF) to VAP include, among others, providing assistance with due diligence, the preparation of Vendor assignment agreements, the monitoring of payment activity and the calculation of prompt payment penalties in accordance with the Vendor Payment Program.

49.     The services provided by BCM (now GC, as successor) include, among others, the review and preparation of trust documents, the preparation of reports required under the Vendor Payment Program and the creation and population of a receivable tracking system. BCM's compensation included a beneficial interest in some of the VAP Managed Trusts. In every instance wherein BCM's compensation included a beneficial interest, the Qualified Purchaser Trusts were required to, and did, publicly disclose BCM's interest.

50.     Since relocating to and/or opening offices in Puerto Rico, Plaintiffs have employed 11 Puerto Rico citizens.

51.     BSF's business activities were not limited to the service agreements with other Plaintiffs. BSF also earned income in Puerto Rico under services contracts with five (5) other entities. Currently, BSF is managed by a six-member Board of Managers, four of whom are Puerto Rico citizens, including Mr. Hynes.

52.     As previously stated, all BCM's assets, obligations and interests were assigned to GC whereas some of BSF's assets, obligations and interests were assigned to GSF.

### C. *Forde & O'Meara's Ongoing Litigation against VAP and the Bluestone Entities*

53.     On March 11, 2021, Forde & O'Meara filed, under seal, a *qui tam* action in the Circuit Court of Cook County, Illinois, as a relator on behalf of the state of Illinois under the Illinois False Claims Act (the "*Qui Tam* Action").

54.     On March 25, 2022, the Defendants served VAP with the complaint in the *Qui Tam* Action, which was then filed under seal, as required by the Illinois False Claims Act ("IFCA").  The *Qui Tam* Action was also filed against the Bluestone Entities.[7]

55.     Between March 28, 2022, and the initial Status Hearing on April 25, 2022, VAP and its counsel were, on multiple occasions, denied access to any pleadings related to the *Qui Tam* Action and court staff informed VAP's counsel that the case was under seal.

56.     On April 25, 2022, at the initial Status Hearing, the judge assigned to the *Qui Tam* Action stated that the complaint would be unsealed but declared the rest of the file would remain under seal.

57.     As of the date of this filing, VAP and the Bluestone Entities still do not have access to the entire docket in the *Qui Tam* Action, because the filings remain under seal.

58.     M. Leonard signed the complaint in the *Qui Tam* Action as the attorney representing Forde & O'Meara in the action and as partner of Leonard LLC.

59.     On information and belief, Defendants had access to all the sealed docket entries in the *Qui Tam* Action.

---

[7] However, the Bluestone Entities were served on May 6, 2022, when service was accepted by their lawyers.

60.     In short, the thrust of the complaint in the *Qui Tam* Action is that VAP purportedly reassigned more than $50 million worth of Qualified Account Receivables to BSF (and to BCM, a former Florida limited liability company[8]) while intentionally concealing those assignments from the state of Illinois. Allegedly, this scheme was done to avoid paying Illinois income taxes on said state's payments to VAP of said Qualified Account Receivables.

61.     In an attempt to shoehorn allegations of violating the VPP Act or the Program Terms into a claim under the IFCA, Forde & O'Meara claims that VAP submitted invoices (corresponding to Qualified Account Receivables) to the state of Illinois that were fraudulent because of lack of required disclosures concerning "assignments" of Qualified Account Receivables to BSF and/or BCM. Such allegations are false.

62.     All facts necessary to corroborate that such allegations are false are published, available to the general public, easily accessible in the IOC's website and in established business law. These facts include, but are not limited to, the following:

      a.  **VAP has never submitted an invoice to the state of Illinois for a Qualified Account Receivable**. As explained above and in accordance with the terms and conditions governing the Vendor Payment Program, it is always the vendor and never the QP that submits the invoice to the State. Therefore, Defendants' allegation that VAP submitted "fraudulent" invoices is necessarily false because VAP *submits no invoices at all*, and Defendants knew that was the case.

      b.  VAP did not have a contract with the state of Illinois and therefore could not submit an invoice for payment to the State.

      c.  The vendors' invoice amount is approved and acknowledged by the state of Illinois prior to purchase by the Qualified Purchaser Trusts. The Qualified Purchaser Trusts have been paid by the State for over 29,000 assignments under the Vendor Payment Program. In every instance, the paid invoice amount was the same amount that was approved and acknowledged by the state prior to purchase.

---

[8] Individual Qualified Purchaser Trusts were required to and did appropriately disclose BCM's beneficial interest in each respective Qualified Purchaser Trust wherever BCM had an interest. As previously stated, BCM is the predecessor of GC, an entity to whom all of BCM's assets, obligations and interests were transferred to.

d.   Since the VPP Formal Start, VAP has **never** been assigned a Qualified Account Receivable under the Vendor Payment Program. Therefore, Defendants' claim that VAP somehow reassigned $50M of Qualified Account Receivables is not only false but also absurd and impossible. In fact, the assignee in every instance was a large, publicly traded financial institution (Bank of America, Barclays and Blackstone) sponsoring a Trust managed by U.S. Bank Trust National Association as Trustee. Those entities and that Trustee did not improperly reassign receivables.

e.   Pursuant to the UCC, the state of Illinois as Account Debtor did not and could not suffer monetary damages based on any of Defendants' allegations and cannot interfere with the assignees' ability to freely assign receivables.

f.   Pursuant to Section II(6) of the Program Terms, VAP and the Qualified Purchaser Trusts were not prohibited from pledging or transferring interests and were not required to seek State pre-approval had they reassigned any interest (see, *supra*, ¶ 32).

g.   Pursuant to Section VI of the State Form Agreement, Qualified Purchasers are only prohibited from reassigning receivables to persons or entities "**outside the Purchaser's control**."

h.   The Vendor Payment Program does not require QPs to be domiciled in Illinois or pay Illinois income taxes. Only 1 current QP (VAP) voluntarily pays Illinois taxes on income it receives from the Qualified Purchaser Trusts for management services. This information is publicly available. Therefore, the allegations that VAP seeks to avoid paying Illinois income taxes are nonsensical and wrong. Additionally, tax-related offenses are not actionable under the IFCA, and Defendants knew that was the case. See, *e.g.*, 740 ILCS 175/3(c).

i.   All IOC and state of Illinois' Vendor Payment Program payments have been made to Delaware domiciled QPs.

j.   The IOC and the state of Illinois have made approximately 38,000 payments totaling over 8 billion dollars and never directed payments to VAP or any other Illinois domiciled entity.

k.   All income derived by VAP has been paid to VAP by the Qualified Purchaser Trusts.

l.   Neither VAP nor the Bluestone Entities have ever received any Vendor Payment Program payments from the state of Illinois.

m.  Consistent with the UCC, the VPP Act and Program Terms state that the penalty for violation of the Program Terms is termination without relief from existing obligations.

n.  The VPP Act required VAP and the Qualified Purchaser Trusts to disclose entities that have direct or indirect ownership of VAP or the Qualified Purchaser Trusts. The VPP Act does not require the listing of service providers.

63.    It is perplexing that Forde & O'Meara, a well-regarded and highly-ranked law firm both regionally and nationally (see, *e.g.*, https://bestlawfirms.usnews.com/profile/forde-o-meara-llp/overview/3762), would opt not only to bring the frivolous *Qui Tam* Action as a Relator but to press on with it in spite of clear and publicly available evidence, including a report from the Illinois Auditor General who audited the Vendor Payment Program, that the Complaint allegations of the *Qui Tam* Action are false.

### D.  *Defendants' Defamatory Statements against Plaintiffs*

64.    After the filing of the sealed *Qui Tam* Action, Defendants have made defamatory statements to the press and through Defendants' colleagues that have affected VAP's, Mr. Hynes' and the Bluestone Entities' reputation and business both in Puerto Rico and stateside, that is, in Illinois and other jurisdictions in which Plaintiffs, particularly Mr. Hynes, have business interests.

65.    Before the complaint in the *Qui Tam* Action was available to the public and to the Bluestone Entities, M. Leonard gave an interview to the press –specifically, WBEZ Chicago– where he discussed the allegations in the *Qui Tam* Action.

66.    On April 4, 2022, before the complaint in the *Qui Tam* Action was available to the Bluestone Entities and the public, WBEZ Chicago published an article by reporter Dan Mihalopoulos ("Mr. Mihalopoulos") that included quotes given by M. Leonard. The article is published in the WBEZ Chicago webpage.

67.     In the article, M. Leonard is quoted as falsely and recklessly saying that the defendants in the *Qui Tam* Action, including VAP and the Bluestone Entities, "are vultures or the proverbial pigs at the trough […] [t]hey're taking advantage of the state's inability to pay and making outrageous profits off that system […] [w]hat they're doing is creating other companies –I would argue shell companies– to take their place in the program, unbeknownst to the state, and then avoid taxation on the millions of dollars they're making from the state program."

68.     From the context of the article, it can be reasonably inferred that M. Leonard was also referring to Mr. Hynes in the above quotes. Indeed, the article focuses on Mr. Hynes and identifies him as the founder of VAP, and there are various references to Mr. Hynes directly.

69.     Upon information and belief, Defendants –and particularly M. Forde– worked with Mr. Mihalopoulos on the content of the article, even providing Mr. Mihalopoulos access to still-sealed documents from the *Qui Tam* Action.

70.     In an interview with the Reporters Committee for Freedom of the Press, Mihalopoulos acknowledged that although he had access to information about VAP, the Bluestone Entities, and Mr. Hynes for two (2) years, it was the receipt of the sealed *qui tam* documents that were the "peg" which enabled him to write and publish the article. See, Reporters Committee for Freedom of the Press, *WBEZ Investigation Explores Fraud Allegations Against Illinois Company* (April 25, 2022), available on: https://www.rcfp.org/wbez-chicaco-vap-investigation/.

71.     On March 30, 2022, before the Court unsealed the complaint in the *Qui Tam* Action, Mr. Mihalopoulos sent Mr. Hynes text messages that contained: (i) the complaint filed under seal and not publicly available until the April 25, 2022, initial status hearing; and (ii) a still-sealed Court Order wherein the Attorney General declined to intervene in the case.

72.     On April 1, 2022, before the complaint in the *Qui Tam* Action was available to the public, a VAP representative spoke to Mr. Mihalopoulos to discuss the forthcoming article. Knowing that the VAP representative also knew M. Forde, Mr. Mihalopoulos directed the VAP representative to speak with M. Forde about the substance of the legal case underlying the story.

73.     Upon information and belief, for several weeks prior to service of the complaint in the *Qui Tam* Action and publishing the WBEZ story, several colleagues of Defendants notified numerous people, including elected and appointed state of Illinois officials, about the forthcoming article.

74.     Moreover, the WBEZ story was reported in other online media outlets after its initial publication. See, *e.g.*, POLITICO, *WBEZ Has a Splashy Story About a Lawsuit Filed Against a "Clout-Heavy Company" Collecting Millions from Illinois* (April 5, 2022), available on:     https://www.politico.com/newsletters/illinois-playbook/2022/04/05/latest-political-campaign-chicago-remap-00022969.

75.     Furthermore, the WBEZ story was retweeted multiple times after its publication, amplifying the reach of Defendants' defamatory remarks.

76.     This underscores the injurious and malicious intent driving the *Qui Tam* Action and the subsequent statements made on the record to Mr. Mihalopoulos for the WBEZ article.

## V.     CAUSES OF ACTIONS

### A.     *First Cause of Action: Defamation and Damages Under the Puerto Rico Civil Code – Injury to Plaintiffs*

77.     Plaintiffs incorporate herein all preceding factual allegations.

78.     In Puerto Rico, defamation may come in two forms: written (libel) or spoken (slander). Luis Santiago v. Santiago, 731 F.Supp.2d 202, 209 (D.P.R. 2010). A defamation cause of action may be grounded on Article 1536 of the Puerto Rico Civil Code, the Commonwealth's

25

Constitution, or Puerto Rico's Libel and Slander Act, 32 LPRA 3141 *et seq*. See, Luis Santiago 731 F.Supp.2d, at 209. See also, Colón Pérez v. Televicentro de P.R., 175 DPR 690 (2009).

79.     A private citizen who seeks redress for defamation, whether written or oral, must prove the following: (1) that information that is false and defamatory was (2) negligently published, with the result that (3) the defamed person suffered real damages. See, *e.g.*, Maldonado y Negrón v. Marrero y Blanco, 121 DPR 705, 715 (1988); Segarra Jiménez v. Banco Popular, Inc., 421 F. Supp. 2d 452, 458 (D.P.R. 2006). Moreover, the information published must be injurious –that is, subjecting the plaintiff up to hatred, contempt or ridicule, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business. 32 L.P.R.A. § 3142-3143; Rodríguez v. Clark Color Lab., 732 F.Supp. 279, 283 (D.P.R. 1990).

80.     Puerto Rico's vicarious liability statute provides for the liability of principals for tortious acts of their agents and employees. See 31 LPRA § 10805(d); Hernández Vélez v. Televicentro, 168 DPR 803, 814-815 (2006). See also, Lausell-Archilla v. Huertas-Nieves, 56 F. Supp. 2d 163, 166 (D.P.R. 1999). Vicarious liability principles apply to defamation actions just as they do in tort law. See, Gómez Márquez v. Periódico el Oriental Inc., 203 DPR 783, 808 (2020).

81.     Therefore, Forde & O'Meara and Leonard LLC are vicariously liable for M. Forde's and M. Leonard's defamatory statements and leaking of sealed documents to the media.

82.     The quoted statements to WBEZ Chicago are objectively false and defamatory on their face. First, the Bluestone Entities were and are not a "shell compan[ies]" by any known definition of that term. BSF had offices and employees in Puerto Rico and had contracts with numerous entities. BCM also had offices of its own and provided specific services to VAP under a service agreement. Second, the Bluestone Entities were not participants in the Vendor Payment

Program and had never received any Vendor Payment Program payment. Third, Vendor Payment Program payments made to Delaware Qualified Purchaser Trusts are taxable in Delaware, not Illinois. Fourth, Defendants knew or should have known before filing the *Qui Tam* Action that income tax offenses are not actionable under the IFCA and that, therefore, their claim under the IFCA was frivolous. Fifth, Plaintiffs had never submitted a claim (invoice) for payment to the state of Illinois and, in fact, were prohibited from doing so because they did not have a contract with the state of Illinois. Sixth, pursuant to Revised Article 9 of the UCC, the state of Illinois did not and could not suffer monetary damages based on the Plaintiffs alleged actions and cannot interfere with the assignee's ability to freely reassign receivables or require approval prior to reassignment. Seventh, Plaintiffs were never assigned an Account Receivable under the Vendor Payment Program to reassign and, if they had, were never prohibited from reassigning. Eight, Plaintiffs were specifically required to disclose (and did) its owners (not service providers). Finally, the VPP Act and Program Terms specifically declare the penalty for violation of the VPP Act or Program Terms. The penalty is termination without relief from existing obligations.

83.     The quoted statements are clearly injurious, as they subject Mr. Hynes and BSF to contempt and public ridicule in Puerto Rico. As to BSF, Defendants' remarks are injurious insofar they alleged that BSF is an instrument created in Puerto Rico to defraud the state of Illinois.

84.     The quoted statements were malicious and reckless. The allegations within the Complaint in the *Qui Tam* Action reflect that Defendants had specialized knowledge about the Vendor Payment Program and Plaintiffs' participation (or lack thereof) in it prior to engaging in the aforementioned defamatory acts. Indeed, M. Leonard had an ethical duty as counsel to investigate and have a factual basis for the allegations in the *qui tam* complaint prior to signing

it. Clearly, since all factual information is publicly available, M. Leonard failed in his ethical duties. Therefore, when speaking to WBEZ, M. Leonard knew or should have known of the falsity of his statements –including that: (a) VAP does not submit invoices to the state of Illinois for Qualified Account Receivables; (b) although not prohibited from reassigning, VAP has never been assigned a Qualified Account Receivable under the Vendor Payment Program and therefore never reassigned a Qualified Account Receivable to the Bluestone Entities (or any other entity), in violation of the Program Terms; and (c) VAP and the Bluestone Entities have never been paid by the state of Illinois. Moreover, the malicious and injurious intent of M. Leonard's statements is underscored by the gratuitous and incendiary reference to VAP, Mr. Hynes and the Bluestone Entities as "vultures or the proverbial pigs at the trough." These statements imply that Plaintiffs were involved in a fraud, or behavior incompatible with the proper conduct of their business, trade or profession.

85.     Because it was foreseeable that these false and slanderous statements would be republished and disseminated through the internet by reporters from WBEZ Chicago, Defendants are also liable for republication libel.

86.     M. Leonard's statements and defendants' actions have substantially harmed Plaintiffs' reputation and business relationships not only in Puerto Rico, but also in Illinois and other jurisdictions where Plaintiffs conduct business, subjecting them to significant economic loss.

87.     For instance, on April 12, 2022 the law firm Fisher Broyles, LLP ("Fisher Broyles"), extended a lucrative offer of partnership to Mr. Hynes, working from Puerto Rico. As per the terms of the offer, Mr. Hynes' expected compensation could have exceeded $1,000,000.00 annually.

88. However, on May 6, 2022, Fisher Broyles wrote to Mr. Hynes referencing the WBEZ article, stating "[t]his article was brought to our attention. Can you let us know if this is you? And if so, what happened?". That same day, Fisher Broyles indicated to Hynes that "[w]hile we are interested in seeing you join, we cannot take on a candidate with a pending fraud allegation, however frivolous" and thus withdrew the offer in direct reaction to the WBEZ article.

89. Therefore, because of M. Leonard's statements and Defendants' actions, Fisher Broyles withdrew its partnership offer to Mr. Hynes.

90. A Fortune 100 Company (the "Fortune 100 Company") that has done business with Plaintiffs and has sold $200,334,728 in Qualified Receivables since 2011 has stopped assigning Qualified Receivables to Qualified Purchaser Trusts managed by VAP, and serviced by the Bluestone Entities under their service agreements with VAP, as a reaction to the WBEZ article. On July 22, 2022, Plaintiffs were informed that the "noise" surrounding the lawsuit was the cause. Plaintiffs' annual revenue from this business relationship exceeded $2,000,000.00 per year.

91. Therefore, M. Leonard's statements and Defendants' actions damaged Plaintiffs insofar as, among other things, they caused the termination of Plaintiffs' business relationship with the aforementioned Fortune 100 Company.

92. As of the filing of this complaint, the damages inflicted by Defendants upon Plaintiffs exceeds $2,000,000.00.

93. The Greysand Entities are entitled to recover the damages inflicted by Defendants upon the Bluestone Entities as their successors.

94. By making these defamatory statements, Defendants have caused Plaintiffs damages under Article 1536 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 10801.

95.     Plaintiffs are also entitled to punitive damages pursuant to Article 1538 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 10803, because the defamatory declarations were made with *dolus*, intent or grave disregard to Plaintiffs' reputation and wellbeing.

96.     Finally, Plaintiffs are entitled to prejudgment interests, costs, and reasonable attorneys' fees.

**B.    *Second Cause of Action (in the Alternative): Defamation and Damages under Illinois Law – Injury to Plaintiffs***

97.     Plaintiffs restate and reallege paragraphs 1 through 76 and paragraphs 81 through 93, and paragraph 96 as if fully set forth herein.

98.     In Illinois, libel and slander are treated alike and the same rules apply to a defamatory statement regardless of whether the statement is written or oral. Ciolino v. Simon, 2021 IL 126024, P29.

99.     The essential elements of a defamation claim are: (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the publication caused damages. Kainrath v. Grider, 2018 IL App. (1st) 172270, P32.

100.    Defendants, as thoroughly set forth in the preceding paragraphs, defamed Plaintiffs by knowingly and maliciously making false statements to the media regarding VAP's, the Bluestone Entities', and Mr. Hynes' involvement in the Vendor Payment Program; referring to Plaintiffs as "vultures or the proverbial pigs at the trough;" and, in support of such statements, by leaking sealed court documents to the press that Defendants knew or should have known, included false statements. (These statements are collectively referred to as "Statements."). Said Statements displayed a reckless disregard as to the matter's falseness.

101.    Defendants' false Statements are defamatory *per se* because they impute the commission of a crime, impute an inability to perform or want of integrity in performing employment duties and/or impute a lack of ability or otherwise prejudice Plaintiffs in their profession and business. Defendants' Statements, when considered as a whole, are not capable of innocent construction.

102.    Moreover, as stated in the preceding paragraphs, all of Mr. Hynes', VAP's, and the Bluestone Entities' actions were in accordance with the laws of the state of Illinois, particularly the VPP Act and the UCC. At all times, Plaintiffs made all necessary disclosures; these disclosures were (and are) available to the public. Thus, Defendants' Statements to the press were done with malice, *i.e.*, with knowledge of their falsehood, and/or with a reckless disregard for their truth or falsity.

103.    In Illinois, there exists an attorney litigation privilege that protects certain attorney communications. That privilege protects attorney statements only where the statement (1) was made in a judicial proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve the objects of the litigation; and (4) involved litigants or other participants authorized by law. See, Kurczaba v. Pollock, 318 Ill.App.3d 686, 702 (1st Dist. 2000).

104.    Statements made by an attorney to the media are not part of the judicial proceeding and therefore not privileged. Lykowski v. Bergman, 299 Ill. App. 3d 157, 166 (1st Dist. 1998).

105.    Defendants' false Statements were not privileged. The leaked documents were sealed and not of public record. Defendants' false Statements were made to the media, specifically to Mr. Dan Mihalopoulos, a reporter for radio station WBEZ that also published the article on its website. Mr Mihalopoulos and WBEZ are third parties with no connection or relation to the litigation. Defendants did not make the Statements in a judicial proceeding or in

furtherance of the object of the litigation. Rather, Defendants made the Statements for the sole purpose of causing harm to Plaintiffs and were malicious and reckless.

106.    Forde & O'Meara and Leonard LLC are liable for M. Forde's and M. Leonard's defamatory statements and leaking of sealed documents to the media.

107.    By making these defamatory statements, Defendants have injured and caused Plaintiffs damages as set forth in the preceding paragraphs.

108.    Plaintiffs are entitled to punitive damages, prejudgment interests, costs, and reasonable attorneys' fees.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and an award of damages in an amount of no less than $3,000,000.00, including actual damages, loss of profits, and punitive damages in an amount to be determined at trial in the maximum amount allowed pursuant to Puerto Rico law, together with prejudgment interests, reasonable attorney's fees, and costs.

## VERIFICATION

I, Brian F. Hynes, of legal age, married, lawyer, and resident of Dorado, Puerto Rico, both in my personal capacity and as duly authorized representative of Vendor Assistance Program, LLC, Blue Stone Finance, LLC, Greysand Finance, LLC, and Greysand Capital, LLC, state under penalty of perjury under the laws of the United States of America that the factual averments of this Verified Complaint are true to the best of my knowledge and belief, except as to those matters alleged upon my information and/or belief, which I also believe to be true.

Executed on this 24th of March, 2023, in Dorado, Puerto Rico.

Brian F. Hynes

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 24th day of March, 2023.

**PIETRANTONI MÉNDEZ
& ÁLVAREZ LLC**
*Attorneys for Brian Hynes*
Popular Center, Piso 19
208 Avenida Ponce de León
San Juan, Puerto Rico 00918
Phone: (787) 274-1212
Fax: (787) 274-1470

*s/ Oreste R. Ramos*
Oreste R. Ramos
USDC No. 216801
oramos@pmalaw.com

*s/Arturo L.B. Hernández González*
Arturo L.B. Hernández González
USDC No. 304601
ahernandez@pmalaw.com

**O'NEILL & BORGES** LLC
*Attorneys for Blue Stone Finance, LLC
and Greysand Finance, LLC*
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel. (787) 764-8181 | Fax. (787) 753-8944

*s/Carlos A. Valldejuly*
Carlos A. Valldejuly Sastre
USDC No. 209505
carlos.valldejuly@oneillborges.com

*s/Jorge A. Candelaria Serrano*
Jorge A. Candelaria Serrano
USDC No. 306004
jorge.candelaria@oneillborges.com

**McCONNELL VALDÉS LLC**
*Attorneys for Vendor Assistance
Program, LLC*
270 Muñoz Rivera Ave.
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Tel. (787) 250-5810
Fax. (787) 759-8282
*s/Henry O. Freese Souffront*
Henry O. Freese Souffront
USDC-PR No. 215502
hf@mcvpr.com

**JUAN R RIVERA FONT LLC**
*Attorneys for Greysand Capital LLC*
27 Calle Gonzale Giusti, STE 602
Guaynabo, Puerto Rico 00968
Tel. (787) 250-8040
*s/Juan R. Rivera Font*
Juan R. Rivera Font
USDC-PR No. 221703
juan@riverafont.com